UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMES QUIGLEY,

Plaintiff,

-v-

UNUM LIFE INSURANCE COMPANY
OF AMERICA,

Defendant.

22-CV-5906 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff James Quigley brings this action against Defendant Unum Life Insurance

Company of America ("Unum") for wrongful denial of disability benefits pursuant to the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Before

the Court are the parties' cross-motions for summary judgment. (ECF Nos. 17, 30.) For the

reasons that follow, both Quigley's and Unum's motions are denied.

I.      Background

        A.      Factual Background

        The following facts are drawn from Quigley's Local Rule 56.1 Statement (ECF No. 19

("Pl.'s SOF")), Unum's Rule 56.1 Statement (ECF No. 33 ("Def.'s SOF")), Unum's Counter

Statement (ECF No. 34 ("Def.'s SOF Opp.")), and Quigley's Counter Statement (ECF No. 41

("Pl.'s SOF Opp.")), and the underlying evidence cited therein. The facts recited here are

undisputed unless otherwise noted.

        James Quigley worked for over twenty-three years in the bond trading department of TP

ICAP Americas Holdings, Inc. ("TP ICAP"), a financial services firm. (Def.'s SOF Opp. ¶ 1.)

On September 29, 2016, Quigley was involved in a car accident. (Pl.'s SOF Opp. ¶ 6.)

Emergency medical professionals arrived at the scene, and Quigley was released without medical care.  (Pl.'s SOF Opp. ¶ 7.)

Over the following months and years, Quigley reported symptoms that he attributed to the car accident, and he sought care from a range of medical providers.  (*See* Def.'s SOF Opp. ¶ 69.)  The following are descriptions of a selection of the providers Quigley visited after the car accident.

In October 2016, Quigley saw his primary care physician, Dr. Sweeti Mehra, at which he complained of headaches and muscle spasms of his head and neck.  (Pl.'s SOF Opp. ¶ 8; ECF No. 27 ("A.R.") at 166.)[1]  In January 2017, Quigley met with Dr. Jeffrey Rosenberg, who documented that Quigley scheduled the appointment for "follow-up of his concussion" that was "sustained in a car accident in September."  (Pl.'s SOF Opp. ¶ 10; A.R. 712.)  Dr. Rosenberg observed that Quigley "continues to have multiple concussions symptoms including headache," "has fatigue and tiredness," and "is having concentration memory problems which are much worse than anything []he has ever had in the past."  (A.R. 712.)  Quigley met with Dr. Rosenberg again in August 2020 for a physical.  (Pl.'s SOF Opp. ¶ 43.)

In May 2017, Quigley had a neurological consult with Dr. Komal Naik due to complaints of "persistent headache," "difficulty with short-term memory," and "some eye strain."  (Pl.'s SOF Opp. ¶ 12.)  Quigley reported to Dr. Naik that he "wakes up almost every day with a headache and about 50% of the time the headaches were actually disruptive [of] sleep."  (Pl.'s SOF Opp. ¶ 16.)  Quigley made multiple subsequent visits to Dr. Naik, including in August 2017, November 2017, April 2018, October 2018, May 2019, October 2019, January 2020, April

---

[1] A.R. refers to the administrative record, submitted at ECF No. 27, and the citations refer to the numerical pagination in the record.

2020, July 2020, October 2020, November 2020, December 2020, January 2021, and March 2021.  (Pl.'s SOF Opp. ¶¶ 22-34, 57-59; A.R. 1535-36.)  Dr. Naik would later opine that Quigley's situation "is not typical," and that his "physical and mental health have deteriorated" rather than improved since the accident.  (Pl.'s SOF ¶ 75.)

In June 2017, Quigley was evaluated by Dr. Vincent Vicci, an optometrist.  (Pl.'s SOF Opp. ¶ 19.)  Dr. Vicci diagnosed Quigley with binocular vision dysfunction and visual-vestibular integration dysfunction, and he opined that Quigley "is having significant difficulty with his focusing system."  (Pl.'s SOF Opp. ¶ 20; A.R. 1006.)  Quigley also had an MRI taken of his brain in June 2017.  (Def.'s SOF Opp. ¶ 97.)

In May 2020, Plaintiff had an evaluation with Rosann Kravetz Toma, DPT.  (Pl.'s SOF Opp. ¶ 35.)  Dr. Toma noted that Quigley had been having headaches since September 2016, and that his medications and Botox injections were "not offering any relief."  (Pl.'s SOF Opp. ¶ 36.)  Quigley met with Dr. Toma at least ten times from May to October 2020.  (Pl.'s SOF Opp. ¶ 41.)

Quigley began a leave of absence from work on November 2, 2020.  (Pl.'s SOF Opp. ¶¶ 49-50.)  That day, Dr. Naik gave Quigley a "physician statement of disability," stating that Quigley's "conditions have rendered him unable to continue regular occupational duties," and that Quigley would be "placed on medical leave . . . for 10 weeks."  (Pl.'s SOF Opp. ¶ 51.)  Several of Quigley's other treating medical providers, such as Dr. Seiden, Dr. Rosenberg, Dr. Toma, and chiropractor Dr. Jeffrey Larkin, opined that Quigley could not continue working.  (Def.'s SOF Opp. ¶¶ 69, 84.)

From September 2016 through when Quigley took his leave of absence, Quigley took no time off work due to his symptoms.  (Def.'s SOF ¶ 45.)

Quigley continued participating in various forms of treatment after he began his leave of absence.  From October 2020 through December 2020, Quigley attended bi-weekly virtual counseling sessions with Brooke Laster, a behavioral health clinician.  (Def.'s SOF ¶ 53.)  In December 2020, Quigley underwent a neuropsychological evaluation performed by psychologist Dr. Leo J. Shea III.  (Def.'s SOF ¶ 56.)  Quigley continued his visits with Dr. Naik and Dr. Toma, both of whom he saw multiple times between November 2020 and February 2021.  (Pl.'s SOF Opp. ¶¶ 57-60.)  In March 2021, Quigley visited Dr. Naik to report an episode in which he "got up to go to the bathroom, and collapsed in the hallway"; his wife "found him unconscious[]."  (Def.'s SOF ¶ 62.)  A few days later, Quigley had an initial intake appointment with psychologist Dr. Douglas Seiden to discuss "difficulty adjusting to repercussions of a motor vehicle accident about 4.5 years ago that resulted in a concussion."  (Def.'s SOF ¶ 68.)  Quigley then saw Dr. Seiden again the next month.  (Def.'s SOF ¶ 81.)  In April 2021, Quigley met with Dr. Matthew McCarthy, a neurologist, who prescribed physical therapy exercises, pain management injections if needed, a muscle relaxant, and reduction and relaxation exercises. (Pl.'s SOF Opp. ¶¶ 77, 80.)  In August 2021, Quigley underwent another neuropsychological evaluation with Dr. van Gorp and Dr. Daren, who concluded that as compared to his 2020 evaluation with Dr. Shea, Quigley "continues to exhibit impairment in several cognitive domains."  (Pl.'s SOF ¶¶ 120-21.)

On November 8, 2020, Quigley submitted a Notice of Claim for short-term disability, long-term disability, and life insurance premium benefits to Unum.  (Def.'s SOF ¶ 52.)

In the months that followed, Unum consulted with medical professionals, who reviewed Quigley's medical documentation to determine whether he met the plans' definitions of disability.  For example, in March 2021, Unum medical specialist Allison Trelegan, RN,

analyzed the available medical records and concluded that the information did not support a finding that Quigley could not perform the occupational demands of his job.  (Pl.'s SOF Opp. ¶ 67.)  In April 2021, Unum asked Julie Guay, Ph.D., to review Dr. Shea's neuropsychological examination report.  (Pl.'s SOF Opp. ¶ 70.)  Dr. Guay opined that Dr. Shea's report contained "inconsistencies in performance within specific domains of functioning," and she concluded that there was no evidence of any functional deficits that would preclude Quigley from performing the duties of his job.  (Pl.'s SOF Opp. ¶¶ 71, 73.)  Unum also consulted with Alex Ursprung, MD, and Dr. Ursprung identified what he perceived to be "validity issues" with Dr. Shea's testing and estimates of Quigley's ability.  (Pl.'s SOF Opp. ¶¶ 74-75.)  In May 2021, James Bress, MD, reviewed Quigley's file and concluded that there was no evidence in Quigley's providers' records suggesting that Quigley could not perform the duties of his job.  (Pl.'s SOF Opp. ¶¶ 84-89.)  Joseph Palermo, MD also reviewed Quigley's records in April 2021, and he opined that Dr. Naik's opinions appeared to be "based solely upon the claimant's description of the symptoms and impairments," and that those self-reported symptoms did not match the objective results of Quigley's exams and diagnostics.  (Pl.'s SOF Opp. ¶¶ 90-93.)

Unum denied Quigley's claim for long-term disability benefits by letter dated May 14, 2021.  (Def.'s SOF ¶ 94; A.R. 1322-27.)  Unum also denied Quigley's claim for life insurance premium waivers by letter dated May 27, 2021.  (Def.'s SOF ¶ 95; A.R. 3925-29.)  As part of Unum's decision process, Unum completed an occupational assessment and identified Quigley's regular occupation as "Bond Department Manager."  (Pl.'s SOF Opp. ¶ 61.)  Quigley appealed both the long-term disability and the life insurance premium waiver denials on December 10, 2021.  (Pl.'s SOF Opp. ¶ 96; A.R. 2305-39.)

As part of the appeal process, Quigley submitted additional materials, including a vocational assessment by Amy Leopold Peiser, MS, CRC.  (Def.'s SOF ¶ 97.)  Unum also continued to ask various professionals to review Quigley's files.  Unum had clinical rehabilitation specialist Shannon O'Kelley review Peiser's report, and O'Kelley concluded that Peiser's report did not alter Unum's view of the vocational demands presented in its original review.  (Pl.'s SOF Opp. ¶¶ 102-03.)  In December 2021, Unum had Megan M. Yeaton, RN, review Quigley's records, and Yeaton concluded, among other things, that Quigley's "reported severity of signs and symptoms are in excess / disproportionate with the total medical evidence on file."  (Pl.'s SOF Opp. ¶ 104.)  In January 2022, Unum also had neurologist Jacqueline Crawford, MD, review Quigley's records, and she concluded that there was no evidence that Quigley was failing at work or making errors due to cognitive impairment, or that there was any evidence of new injuries or illness just prior to Quigley's exit from work in November 2020.  (Pl.'s SOF Opp. ¶ 106.)  That same month, psychiatrist Peter Brown, MD, reviewed Quigley's documents and concluded that any restrictions and limitations due to psychiatric conditions would not be supported by the evidence.  (Pl.'s SOF Opp. ¶¶ 113-14.)

Unum shared Dr. Crawford's report with Quigley, who then submitted additional supporting materials on February 9, 2022.  (Def.'s SOF ¶ 115.)  Unum sent those materials to Dr. Crawford, who authored an addendum concluding that her opinion remained unchanged.  (Pl.'s SOF Opp. ¶ 116.)  Unum sent Dr. Crawford's addendum to Quigley, who then submitted an additional round of documents in March 2022.  (Def.'s SOF ¶ 117.)

On April 12, 2022, Unum informed Quigley by letter of its decision upholding its denial of Quigley's claim for long-term disability and life insurance benefits.  (Pl.'s SOF Opp. ¶ 121; A.R. 3523-34.)

### B.      Procedural History

On July 11, 2022, Quigley brought this action against Unum seeking long-term disability

benefits, waiver of life insurance premium benefits, related declaratory relief, and attorney's fees

and costs.  (ECF No. 1.)  On September 12, 2022, Unum filed an answer.  (ECF No. 15.)  On

December 2, 2022, Quigley moved for summary judgment.  (ECF No. 17.)  On January 17,

2023, Unum cross-moved for summary judgment.  (ECF No. 30.)  On March 14, 2023, Quigley

filed an opposition to Unum's cross-motion for summary judgment and a reply in support of his

own motion for summary judgment.  (ECF No. 39.)  On April 18, 2023, Unum filed a reply in

support of its cross-motion for summary judgment.  (ECF No. 45.)[2]

On August 2, 2023, Quigley alerted the Court to the fact that in July 2023, the Social

Security Administration ("SSA") found that Quigley was disabled under it rules beginning on

November 2, 2020.  (ECF No. 48 ¶ 3; ECF No. 48-1.)  On August 4, 2023, Unum filed

objections to Quigley's letter, taking the position that the Court should not consider Quigley's

SSA award in the dispute before it.  (ECF No. 49.)

## II.      Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is

---

[2] Before the Court is also a motion that Unum filed on January 17, 2023 to strike
Quigley's Local Rule 56.1 statement as non-compliant with the Rules.  (ECF No. 28.)  Quigley
filed an opposition to Unum's motion to strike on March 14, 2023 (ECF No. 38), and Unum filed
a reply in support of its motion to strike on April 18, 2023 (ECF No. 42).  Unum's motion to
strike is denied.  Such motions "are generally disfavored and will not be granted," and they are
"particularly disfavored in the Rule 56.1 context."  *Pearlstein v. BlackBerry Ltd.*, No. 13-CV-
7060, 2022 WL 19792, at *7 (S.D.N.Y. Jan. 3, 2022) (internal quotation marks and citation
omitted).  To the extent that Quigley improperly incorporates arguments and legal conclusions
into its Rule 56.1 Statement, the Court simply declines to consider those statements instead of
striking them or ordering sanctions, as Unum requests.

material if it "might affect the outcome of the suit under the governing law." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if, considering the record as

a whole, a rational jury could find in favor of the non-moving party.  *Ricci v. DeStefano*, 557

U.S. 557, 586 (2009).

In deciding a motion for summary judgment, a court must consider the evidence "in the

light most favorable to the non-moving party and draw all reasonable inferences in its favor."

*Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995).  "It is well established that '[c]redibility

assessments, choices between conflicting versions of the events, and the weighing of evidence

are matters for the jury, not for the court on a motion for summary judgment.'"  *Curry v. City of*

*Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) (alteration in original) (quoting *Fischl v. Armitage*,

128 F.3d 50, 55 (2d Cir. 1997)).  Accordingly, "the trial court's task at the summary judgment

motion stage of the litigation is carefully limited to discerning whether there are any genuine

issues of material fact to be tried, not to deciding them."  *Gallo v. Prudential Residential Servs.,*

*Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  In cases involving cross-motions for summary

judgment, "the court must evaluate each party's motion on its own merits, taking care in each

instance to draw all reasonable inferences against the party whose motion is under

consideration."  *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017) (quoting

*Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).

## III.    Discussion

### A.    Standard of Review

A "denial of benefits challenged under [ERISA § 502(a)(1)(B)] is to be reviewed under a

*de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the terms of the plan."  *Krauss v.*

*Oxford Health Plans, Inc.*, 517 F.3d 614, 622 (2d Cir. 2008) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  "If the insurer establishes that it has such discretion, the benefits decision is reviewed under the arbitrary and capricious standard." *Id.*  In determining whether the plan delegates such discretionary authority to the administrator, "[a]mbiguities are construed in favor of the plan beneficiary." *Id.*  Absent a "clear reservation of discretion the plan administrator," however, a "*de novo* standard of review applies to all aspects of the denial of an ERISA claim, including fact issues." *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003) (quoting *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 245 (2d Cir. 1999)).

The parties dispute which standard of review applies, with Quigley arguing for *de novo* review (ECF No. 39 at 8-13) and Unum arguing for review under a more deferential arbitrary and capricious standard (ECF No. 32 at 27-29).  Unum's plans do contain some discretionary language, as they prescribe that a claimant will be granted benefits "when Unum determines that" a number of criteria have been met.  (Pl.'s SOF Opp. ¶¶ 1, 4).  But courts have found that such language does not automatically grant discretion upon the administrator when the plan language also contains objective standards, because reading the language that way would "effectively amend[] the provision to find disability 'when [the administrator] determines *to its satisfaction*'" that various conditions are met.  *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 108-09 (2d Cir. 2005); *see, e.g.*, *Durham v. Prudential Ins. Co of Am.*, 890 F. Supp. 2d 390, 393-95 (S.D.N.Y. 2012) (concluding that language similar to Unum's policy here justified *de novo* review).

Although Unum now asserts that the *de novo* standard should not apply, it conceded twice in its answer to Quigley's complaint that Unum "does not dispute application of *de novo*

review in this case." (ECF No. 15 ¶¶ 25, 28.)  Unum argues that it should be allowed to amend its answer to remove or modify those statements.  (ECF No. 32 at 28-29.)  Unum's request is governed by Rule 15(a)(2), which provides that a party may amend a pleading "only with the opposing party's written consent or the court's leave," and that "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  A district court "has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

The Court denies Unum's request to amend its answer.  Here, "granting leave would negate [prior] work, waste [prior] efforts, and largely send the parties back to the discovery drawing board," causing prejudice to Quigley, who relied on Unum's previous representations in developing its litigation strategy to date.  *Birmingham Firemen's and Policemen's Supplemental Pension Sys. v. Ryanair Holdings PLC*, No. 18-CV-10330, 2022 WL 4377898, at *1 (S.D.N.Y. Sept. 22, 2022) (internal quotation marks and citation omitted).  Moreover, Quigley also explains that had Unum contested the standard of review, Quigley would have pursued discovery about Unum's inherent conflict of interest as both determiner and payor of claims — discovery that might have uncovered relevant material under the arbitrary and capricious standard.  *See McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008) (The [Supreme] Court clarified that . . . such a 'conflict should be weighed as a factor in determining whether there is an abuse of discretion.'" (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008))); *see also Tretola v. First Unum Life Ins. Co.*, No. 13-CV-231, 2013 WL 2896804, at *2 (S.D.N.Y. June 13, 2013) ("[S]ome amount of discovery is necessary, to enable the Court to determine the

extent and nature of the conflict and the appropriate weight to give this conflict in the ultimate merits analysis.").

The Court therefore proceeds to conduct a *de novo* review of Unum's decision to deny Quigley benefits.  Under such review, a court "stands in the shoes of the original decisionmaker, interprets the terms of the benefits plan, determines the proper diagnostic criteria, reviews the medical evidence, and reaches its own conclusion about whether the plaintiff has shown, by a preponderance of the evidence, that she is entitled to benefits under the plan."  *McDonnell v. First Unum Life Ins. Co.*, No. 10-CV-8140, 2013 WL 3975941, at *12 (S.D.N.Y. Aug. 5, 2013) (internal quotation marks and citations omitted).  "[R]egardless of the district court's standard of review of the plan administrator's denial of benefits," however, "a district court may not grant a motion for summary judgment if the record reveals a dispute over an issue of material fact." *O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 642 F.3d 110, 117 (2d Cir. 2011).

### B.      Unum's Denial of Quigley's Claims

Quigley's claims are governed by employee welfare benefit plans issued by Unum. (Def.'s SOF Opp. ¶¶ 8-9, 19-20.)  Unum's long-term disability policy defines disability, in relevant part, as follows: "You are disabled when Unum determines that due to your sickness or injury . . . you are unable to perform the material and substantial duties of your regular occupation and are not working in your regular occupation or any other occupation."  (Pl.'s SOF Opp. ¶ 1.)  Relatedly, Unum's life insurance policy deems someone disabled "when Unum determines that . . . during the elimination period, you are not working in any occupation due to your injury or sickness; and after the elimination period, due to the same injury or sickness, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by training, education or experience."  (Pl.'s SOF Opp. ¶ 4.)

"[A]s a matter of general insurance law, the insured has the burden of proving that a benefit is covered, while the insurer has the burden of proving that an exclusion applies." *Mario v. P&C Food Mkts., Inc.*, 313 F.3d 758, 765 (2d Cir. 2002). Quigley therefore "bears the burden of proving by a preponderance of the evidence that he was 'disabled' as defined by the Plan and therefore entitled to benefits under it." *Kagan v. Unum Provident*, 775 F. Supp. 2d 659, 671 (S.D.N.Y. 2011). In the review of Unum's decision to deny Quigley benefits, "the presumption is that judicial review 'is limited to the record in front of the claims administrator unless the district court finds good cause to consider additional evidence.'" *Muller*, 341 F.3d at 125 (quoting *DeFelice v. Am. Int'l Life Assurance Co. of N.Y.*, 112 F.3d 61, 67 (2d Cir. 1997)). Accordingly, the Court bases its analysis on the same materials that Unum had before it when it assessed Quigley's claim.[3]

The Court ultimately concludes that there are genuine disputes of material fact, and as a result, neither Quigley nor Unum is entitled to summary judgment. At the outset, there is a genuine dispute of material fact over what duties are properly considered to be part of Quigley's occupation. More broadly, the parties offer dueling facts and medical opinions on whether

---

[3] While Quigley submitted documentation of the Social Security Administration's (SSA's) award of benefits to Quigley upon a finding that he became disabled on November 2, 2020 (ECF Nos. 47, 48), that "SSA decision . . . was made after [Unum's] review had been completed and has little independent probative value" to his ERISA claim. *Muller*, 341 F.3d at 125-26. In general, "the Second Circuit has precluded expansion of an administrative record to include additional evidence 'offered to establish a historical fact pertaining to the merits of [a] claim' that was not before the administrator that denied a particular claim." *Fredrich v. Lincoln Life & Annuity Co. of N.Y.*, 603 F. Supp. 3d 38, 49 (E.D.N.Y. 2022) (internal quotation marks and citation omitted). The SSA's determination became effective in June 2023, over a year after Unum's final denial of Quigley's benefits. (Pl.'s SOF Opp. ¶ 121.) Moreover, the documentation submitted by Quigley does not contain information about the SSA's rationale in granting him benefits. (*See* ECF No. 48-1, 48-2.) The Court accordingly declines to consider the SSA award in its analysis.

Quigley's conditions rise to the level of disability under Unum's plans, rendering summary judgment inappropriate at this stage.

### 1.    Quigley's Occupation

Unum's long-term disability policy defines "regular occupation" as "the occupation you are routinely performing when your disability begins."  (Pl.'s SOF Opp. ¶ 2.)  The policy specifies that Unum "will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location."  (*Id.*)

Unum claims that Quigley's regular occupation is a Bond Department Manager, whereas Quigley asserts that his role was Senior Bond Broker and Trading Desk Manager.  (Def.'s SOF Opp. ¶ 1.)  While the difference may seem semantic, at the heart of the parties' dispute is a disagreement about the nature of Quigley's duties, as evidenced by their disagreement over nearly every facet of those duties.  (*See* Def.'s SOF Opp. ¶¶ 30-56.)

Unum determined in its occupational assessment that Quigley's role, as it is normally performed in the national economy, entailed "managing and coordinating brokerage activities," such as "monitoring trading, perform[ing] buying and selling orders and building and maintain[ing] buyer relationships," as well as managing "16 traders and budgeting and profitability" for the group.  (ECF No. 32 at 33; A.R. 1407.)  The parties dispute whether, in addition to his managerial role, Quigley also spent material time executing trades himself.  For example, while Quigley argues that he is disabled in part because he cannot meet the demands of handling transactions on the trading floor (ECF No. 17 at 9-12), Unum suggests that executing trades is not a material duty of his role as a manager, as managing traders is distinct from being a trader oneself (ECF No. 45 at 2).

Although Unum argues that Quigley's role as a manager does not necessarily entail Quigley executing trades himself, the evidence in the record supports the conclusion that Quigley's role did involve executing at least some trades.  Indeed, even Unum's own vocational analyses acknowledge that responsibility as party of Quigley's role, as one analysis lists "perform[ing] buying and selling orders" as one of the "duties" of his job in one analysis (ECF No. 32 at 40; A.R. 1407), while another acknowledges that Quigley's job description included "arrang[ing] or execut[ing] trades from client orders on the desk" (Def.'s SOF Opp. ¶ 213; A.R. 3053).  Those observations are corroborated by other evidence in the record, such as Quigley's official job description (Pl.'s SOF Opp. ¶ 5; A.R. 1372), as well as statements by Quigley's supervisor, who attested that Quigley is employed as a "Broker" (and a "Desk Manager") who is "responsible for following markets closely . . . and handling trade executions" (Pl.'s SOF ¶ 35; A.R. 2919).

Still, the parties disagree on the material duties of a trader and the necessary skills to perform such a role.  Quigley argues that Unum "failed to consider some of the most demanding and relevant aspects of Quigley's occupation," such as the ability to work long continuous hours, the "intense audiovisual requirements" of the job (such as toggling between multiple screens), the need to maintain focus on a busy and loud trading floor, and the "high-level cognitive requirements" associated with Quigley's role.  (ECF No. 17 at 22.)  Quigley also cites Peiser's vocational report, which characterizes some of those traits as also being relevant in the "general economy" for Quigley's occupation and not just Quigley's employer.  (Def.'s SOF Opp. ¶ 155; A.R. 2521-22.)  For its part, Unum criticizes Peiser's report as irrelevant because of her alleged failure to review key pieces of vocational documentation on which Unum based its decision.  (ECF No. 32 at 33.)  Unum takes the position that even if the heightened requirements Quigley

describes apply to his role at TP ICAP, Quigley has not put forth sufficient evidence to demonstrate that those are requirements of his role in the national economy.  (ECF No. 32 at 32-33, ECF No. 45 at 4.)

A reasonable factfinder could adopt Quigley's description of his role in the national economy and conclude that he supported that description with a preponderance of the evidence. A reasonable fact finder could also, however, determine that Quigley has not carried his burden to show that the specific duties Quigley details are characteristic of the general role of a bond trader or manager more broadly.  The content of Quigley's job responsibilities and the skills required to perform those responsibilities constitute material facts, as those standards will govern any evaluation of Unum's denial.  As a result, summary judgment is inappropriate at this stage.

### 2.      Quigley's Disability Determination

Quigley focuses his argument on three difficulties — his inability to fulfill the role's high-level cognitive demands, his inability to fulfill its audiovisual demands, and his inability to complete a normal workday or workweek on a sustained basis — which he argues are supported by his medical providers' opinions and which render him unable to perform the material duties of his occupation.  (ECF No. 17 at 5-14.)  Unum responds that while Quigley may suffer some symptoms, he fails to marshal enough evidence to demonstrate a disabling functional impairment, and Unum cites its own medical reviewers' opinions to support its position.  (ECF No. 32 at 34-46.)

Given the parties' competing factual contentions, as well as the conflicting medical opinions they provide, the Court cannot grant either party summary judgment at this time.  The administrative record contains numerous reports by Quigley's providers opining that, due to various symptoms and conditions, Quigley cannot maintain his regular occupation.  For example,

Dr. Shea stated that Quigley's "overall memory abilities are at significant deficit and are of major concern," that Quigley's test results "demonstrate[] his deficient ability to reason and mentally analyze complex data under timed conditions." (Def.'s SOF Opp. ¶¶ 113, 118; A.R. 746, 748.) Ultimately, Dr. Shea concluded that "Quigley is disabled from his own occupation or any which would require similar training and expertise based on his deficient and variable cognitive functioning." (Def.'s SOF Opp. ¶ 119; A.R. 750.) Dr. Naik, who evaluated Quigley regularly between 2017 and 2021, similarly opined that Quigley's "persistent neurological symptoms are chronic and permanent at this time and attributed to his traumatic brain injury," rendering him "disabled and unable to perform the duties of his occupation." (Def.'s SOF Opp. ¶¶ 132-33; A.R. 1107.) Upon being informed that Dr. Crawford did not believe that Quigley was disabled, Dr. Rosenberg responded that Quigley was consistently suffering from "severe symptoms of almost daily headaches . . . severe dizziness, visual difficulties, vestibular dysfunction, light and sound sensitivity, and mood issues from chronic pain" — symptoms that "persisted despite treatments" and resulted in Dr. Rosenberg's opinion that "Quigley was certainly unable to return to work as a bond trader." (Def.'s SOF Opp. ¶ 140; A.R. 3120.)

On the other hand, Unum also conducted its own independent medical reviews of Quigley's medical records, and its professionals concluded that Quigley had not provided sufficient evidence of disability. Dr. Crawford based her conclusion that the "sum of the evidence" did not support a finding of disability on multiple factors, such as her views that the conclusions of Quigley's medical providers "are inconsistent with the sum of the evidence on file," that the treatment options Quigley's providers pursued were insufficiently aggressive as compared with Quigley's reported symptoms, and that Quigley appeared to excel at work during the relevant period despite his symptoms. (Pl.'s SOF Opp. ¶¶ 111-12; A.R. 3073-75.) Dr.

Brown similarly reviewed Quigley's medical files and concluded that "[r]estrictions or limitations due to psychiatric condition are not asserted or supported by the available evidence," as "evaluation and treatment have been limited" and Quigley's symptoms of anxiety and depression "fluctuated between mild and moderate severity."  (Pl.'s SOF Opp. ¶ 114; A.R. 3099-3100.)  And while Quigley asserts that Dr. Crawford and Dr. Brown's opinions are unreliable because they contain significant errors, Unum's responses provide enough evidence to the contrary such that their opinions are not unreliable as a matter of law.  (ECF No. 32 at 40-46.)

Moreover, while Unum consulted with Dr. Crawford and Dr. Brown during the appeal, it also consulted with other medical professionals during the pendency of Quigley's claim, who reached similar conclusions.  For example, Dr. Ursprung identified what he perceived to be "validity issues" with some of Quigley's test results, as well as certain test results that suggested that "the pattern of test scores is not consistent with an underlying neurological condition." (Pl.'s SOF Opp. ¶¶ 74-75; A.R. 1135.)  Dr. Ursprung therefore concluded that the "obtained results are likely an underestimate of the insured's functional ability," and that while Quigley "may have some psychological issues/symptoms," they "do not rise to a level that would be impairing."  (Pl.'s SOF Opp. ¶¶ 75-76; A.R. 1136.)  Reviews by other medical professionals retained by Unum reached similar conclusions.  (*See, e.g.*, A.R. 1284-89.)

"At bottom," when "the evidence in the record . . . reveals a conflict between 'competing physician opinions,'" as it does here, "such conflicting medical opinions as to whether the claimant is disabled amount to a genuine factual dispute sufficient to preclude summary judgment."  *Sigal v. Metro. Life Ins. Co.*, No. 16-CV-3397, 2018 WL 1229845, at *11 (S.D.N.Y. Mar. 5, 2018) (quoting *O'Hara*, 642 F.3d at 117).  "Absent any indication that [a doctor's] opinion is unreliable as a matter of law, the differing opinions of . . . doctors present a genuine

issue as to the material fact of [a claimant's] medical condition." *Napoli v. First Unum Life Ins. Co.*, 78 F. App'x 787, 789 (2d Cir. 2003) (summary order).

Beyond disputes about which medical opinions are more accurate, additional disputes over material facts persist.  For one, the parties dispute whether the level of treatment that Quigley received supports or undermines his claim of disability.  Quigley asserts that he has pursued various treatments and medications to no avail (*see* ECF No. 39 at 18-21), while Unum claims that his treatment plans have not been aggressive enough to support a finding of disability (ECF No. 32 at 37-39).  Reasonable finders of fact could reach different conclusions based on the record, and "[i]f there is a genuine dispute about whether the employee was disabled, this question is for the factfinder."  *O'Hara*, 642 F.3d at 119.

As another example, reasonable finders of fact could agree or disagree with Unum's characterization of Quigley's file as largely containing self-reported symptoms and lacking in objective corroboration of those symptoms.  (*See* ECF No. 32 at 36-37.)  And, even if they agreed with that characterization, they could validly disagree on how much weight to accord that characterization.  On the one hand, "it is not unreasonable for ERISA plan administrators to accord weight to objective evidence that a claimant's medical ailments are debilitating in order to guard against fraudulent or unsupported claims of disability."  *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 88 (2d Cir. 2009); *see also Milano v. Provident Life & Casualty Ins. Co.*, No. 19-CV-3357, 2020 WL 7388689, at *8 (S.D.N.Y. Dec. 16, 2020) ("Although Plaintiff's self-reports of his symptoms are certainly *some* evidence of his purported limitations, such self-reports alone do not persuade the Court that he was unable to perform the duties of a bond trader.").  On the other hand, the Second Circuit "has long recognized that subjective complaints of disabling conditions are not merely evidence of a disability, but are an 'important factor to be considered

in determining disability.'"  *Miles v. Principal Life Co.*, 720 F.3d 472, 486 (2d Cir. 2013)

(quoting *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001)).

Similarly, reasonable factfinders could disagree on how to consider the fact that Quigley

continued working for several years after his car accident, which Unum cites as evidence that

Quigley was not "unable to perform" the duties of his occupation.  (ECF No. 32 at 36.)  A

reasonable factfinder might see such evidence similarly to Unum.  *See, e.g.*, *Hershman v.*

*Unumprovident Corp.*, 660 F. Supp. 2d 527, 533 (S.D.N.Y. 2009) ("[T]here is far too much

continuity between [the claimant's] work before and after the onset of his back condition to

sustain a 'total disability' finding."))  But there is no "blanket rule that an employee, as a matter

of law, cannot be disabled when she is present at work."  *O'Hara*, 642 F.3d at 118.  As Quigley

observes, then, courts have cautioned that the "fact that [a plaintiff] persevered in continuing to

work despite his chronic fatigue and pain should not be used against him."  *Khan v. Provident*

*Life & Accident Ins. Co.*, 386 F. Supp. 3d 251, 271 (W.D.N.Y. 2019) (citing cases); *see also*

*Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003) ("A

disabled person should not be punished for heroic efforts to work by being held to have forfeited

his entitlement to disability benefits should he stop working."); *Perryman v. Provident Life &*

*Accident Ins. Co.*, 690 F. Supp. 2d 917, 950 (D. Ariz. 2010) ("[N]umerous courts have

recognized that a disability claimant can still be found to be disabled even if he or she worked for

some period after the onset of disability.")

Reasonable finders of fact could also choose to weigh the various professional opinions

differently due to the circumstances in which they were formed.  Quigley highlights the fact that

none of Unum's medical professionals personally examined Quigley (*see, e.g.*, ECF No. 17 at

16), and "courts sometimes accord greater weight to the opinion of a treating physician . . . who

may be more familiar with a patient's medical condition than a doctor who never examined [a claimant] and who is hired by his adversary," *Sigal*, 2018 WL 1229845, at *11.  But it is also "permissible" for an administrator to "'rely on a medical records review' without 'obtain[ing] an independent medical evaluation' in assessing [one's] claim."  *Id.* (quoting *Alberigo v. Hartford*, 891 F. Supp. 2d 383, 399 (E.D.N.Y. 2012)).  "Such a credibility determination is appropriate at a trial, but it exceeds the scope of a judge's authority in considering a summary judgment motion."  *Napoli*, 78. F. App'x at 789.

Finally, the parties also appear to dispute the definition of "disability" under Unum's policies.  That dispute, however, is largely resolved by the text of Unum's policy.  Quigley argues that a claimant can be disabled under Unum's standard even if he can perform some of the duties on a full-time basis, so long as he is "limited" from being able to perform those duties. (ECF No. 17 at 3.)  Unum is correct that, to the extent Quigley argues that he is entitled to benefits if he has difficulty performing (but can still perform) the material and substantial duties of his job, Quigley is wrong.  (ECF No. 32 at 31-32.)  Unum's policy clearly requires a showing that someone is "unable to perform the material and substantial duties" of the relevant occupation.  (Pl.'s SOF Opp. ¶ 1.)  *Cf. Young v. Hartford Life & Accident Ins. Co.*, No. 09-CV-9811, 2011 WL 4430859, at *9 (S.D.N.Y. Sept. 23, 2011) ("Although she claims that the headaches were frequently severe, she has not documented that the headaches ever forced her to stay home from work during the period she was employed.  This information is important because under the terms of [claimant's] plan, it is not enough for [claimant] to demonstrate that she suffers from migraines; she must also demonstrate that the migraines were so disabling that she was unable to perform her duties . . . .").  Of course, whether Quigley has submitted enough evidence to meet that standard is a question for a finder of fact.

Given the medical records and opinions provided by Quigley, the Court does not doubt that such a factfinder could conclude that Quigley demonstrated his eligibility for benefits by a preponderance of the evidence.  Still, "regardless of the district court's standard of review of the plan administrator's denial of benefits, a district court may not grant a motion for summary judgment if the record reveals a dispute over an issue of material fact."  *O'Hara*, 642 F.3d at 117.  Accordingly, because disputes over material facts exist at this stage, the Court denies both Quigley's motion for summary judgment and Unum's cross-motion for summary judgment.

### C.    Full and Fair Appeal

Quigley argues, in the alternative, that the Court should overturn Unum's denial because Unum denied Quigley a "full and fair review" as required by law.  (ECF No. 17 at 23-25.)  Specifically, the relevant ERISA regulations state that "in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment . . . the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment."  29 C.F.R. § 2560.503-1(h)(3)(iii).  Quigley contends that Unum failed to meet this duty because Unum did not have a medical professional review all the supplemental materials that Quigley submitted while the appeal was pending.

Unum discharged its duty by consulting with Dr. Crawford and Dr. Brown, both of whom are health care professionals, when deciding Quigley's appeal.  Even if Unum did not review a subset of documents that Quigley submitted shortly before Unum announced its decision, the relevant regulations "do not state that [the health care professional is] required to address each document in detail before arriving at a determination."  *Wallace v. Grp. Long Term Disability Plan for Emps. of Tdameritrade Holding Corp.*, No. 21-CV-1019, 2022 WL 2207926, at *2 (2d

Cir. June 21, 2022) (summary order).  Here, Unum had already considered a round of supplemental materials that Quigley submitted for his appeal on February 9, 2022, after Quigley had received a copy of Dr. Crawford's initial report.  (Def.'s SOF ¶ 115.)  Dr. Crawford reviewed those additional materials and wrote an addendum addressing them, at which point Quigley submitted yet another additional round of documents on March 31, 2022, which serve as the basis of Quigley's argument.  (Pl.'s SOF Opp. ¶¶ 116-17.)  The administrative record must close at some point, and a claimant cannot keep an appeal open by continuing to submit piecemeal supplements.  Quigley cites no authority for the proposition that Unum acted unlawfully by determining that the additional materials would not meaningfully add new information to the voluminous evidence already in the record.  (*See* ECF No. 45 at 10.)  Accordingly, Quigley received a full and fair review.

## IV.     Conclusion

For the foregoing reasons, Quigley's motion for summary judgment (ECF No. 17) is DENIED and Unum's cross-motion for summary judgment (ECF No. 30) is DENIED.  Unum's motion to strike (ECF No. 28) is DENIED for the reasons explained in footnote 2.

The parties shall file a joint status letter by October 20, 2023, indicating how they propose to proceed with this case, including whether they consent to a "bench trial on the papers," in which the Court would resolve all material factual disputes.  *See, e.g.*, *Barbu v. Life Ins. Co. of N. Am.*, 35 F. Supp. 3d 274, 279 (E.D.N.Y. 2014).

The Clerk of Court is directed to close the motions at Docket Numbers 17, 28, and 30.

SO ORDERED.

Dated:  September 29, 2023
       New York, New York

J. PAUL OETKEN
United States District Judge